**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James A. "Bubba" MATHIS,
Defendant-Appellant.**

No. 76–2723.

United States Court of Appeals,
Fifth Circuit.

Sept. 16, 1977.

---

John Tucker, Birmingham, Ala., Rowan S. Bone, Gadsden, Ala., for defendant-appellant.

Wayman G. Sherrer, U. S. Atty., Ann C. Robertson, James C. Thomason, III, Asst. U. S. Attys., Birmingham, Ala., for plaintiff-appellee.

Before TUTTLE, TJOFLAT, and HILL, Circuit Judges.

JAMES C. HILL, Circuit Judge:

In the Northern District of Alabama, appellant James A. "Bubba" Mathis was charged with violating 18 U.S.C. § 922(j) which makes it a crime "for any person to receive, conceal, store, barter, sell or dispose of any stolen firearm or stolen ammunition, or pledge or accept as security for a loan any stolen firearm or stolen ammunition, which is moving as, which is part of, or which constitutes, interstate or foreign commerce, knowing or having reasonable cause to believe that the firearm or ammunition was stolen." Mathis appeals from the jury verdict and judgment finding him guilty as charged.

The operative facts of this unusual case may be said to have arisen in July of 1975, when appellant Mathis and his father, a gun collector, ate dinner with a Dr. Donald Creed of Greenville, South Carolina. Dr. Creed was also an avid collector of firearms and had a quite valuable collection of approximately 225 weapons. While a guest at the Creed residence, the defendant viewed his host's entire collection of firearms.

Subsequently, on October 10–11, 1975, the Creed residence was burglarized. Dr. Creed found his collection reduced to 50 weapons. However all hope was not lost.

Approximately two weeks after his guns were stolen, Dr. Creed was in Atlanta, Georgia attending a gun show when he saw one of his guns on the table of a firearms trader. The Doctor immediately recognized his custom made Franze Sodia, 12 × 12 × 270 Winchester Drilling with a Ziss Variable scope. The gun was replete with intricate inlays of gold and silver depicting a hunter and a number of game scenes.

The Alcohol, Tobacco, and Firearms (ATF) Division of the Treasury Department was immediately notified, and ATF agents

began tracing the previous movement of the weapon. The trail was hot, and it quickly led the ATF agents to defendant Mathis and Wanda McPeters Mathis.

Wanda McPeters Mathis had married the appellant in August of 1974 and had been privy to evidence which was more than sufficient to insure the conviction of Mathis for the transportation of the stolen firearms.

However, marital difficulties soon arose, and on February 12, 1976, the couple were divorced. The ATF agents seized upon this opportunity and interviewed the then Wanda McPeters. The interviews resulted in a number of sworn statements that provided the ATF agents with evidence critical to their case.

Meanwhile, it appears that the defendant learned that his former wife had been cooperating with the investigating authorities.

In a statement given to ATF agents on March 18, 1976, Wanda McPeters related how Mathis had recently promised her $4,000.00, full custody of their baby, Chris, and consent to letting the infant's surname be changed to McPeters if she would not testify against him. She refused.

The statement also related that on March 16, Mathis had again contacted her and informed her that if she would remarry him, friends of another participant would give them $25,000.00. This offer was reinforced by a telephone call by one of the men telling her that Mathis, herself, and their baby would be killed if the remarriage did not occur.

Subsequent to these events, Ms. McPeters appeared before the grand jury, repeated the substance of her previous statements and once again swore to the truthfulness of the statements. An indictment was returned against the defendant on April 6, 1976.

On April 21, 1976, the defendant and Wanda were remarried.

Trial commenced on June 7, 1976. Previously, the Government had given notice to the defendant of the statements and of their contents. At the trial the government called Wanda McPeters Mathis as its witness. A hearing was then conducted out of the presence of the jury to determine whether a spousal privilege existed and whether Mrs. Mathis was proposing to and would claim the privilege. If so, the Court was called upon to determine if Mrs. Mathis was therefore unavailable, and whether or not her sworn statements could be admitted into evidence.

At the hearing, Mrs. Mathis testified that she did not wish to testify against her husband. "I don't want to testify against my husband at all. I've got that privilege."

However, the witness did not state that she would refuse to testify if the claim of privilege were denied.

THE COURT: . . . If the Government calls you to the stand and asks you questions about your statements, these statements, how would you respond to them? What would you do?

A: If I was made to tell you, I would tell the truth.

THE COURT: If you were made to say, you would tell the truth. So, if I take the position that the second marriage, that you were coerced into that marriage, threatened into that second marriage, or that you were frightened into it or that you are frightened now, and told you to answer the questions, you would answer them truthfully?

A: If I had to, yes, sir.

The witness again affirmed that the previous statements she had given were true.

The trial judge, the transcript reveals, was concerned for the health and the well being of the witness who had been threatened and intimidated into marrying the defendant. He was also concerned that the witness, if forced to testify, might commit perjury in light of her fear. He ruled as follows:

THE COURT: And I'm coming to the conclusion that, like I stated before, rather than make this girl testify and put her in that position, I have an alternative that I think is fair under the circumstances and I believe that I should follow, and

that is, since she has told me that the statement contains the truth and reiterated it to you, I'm going to let the Government put the agents who took this statement on the stand and let them testify as to what the statements contained.

Yet following this ruling, the trial judge continued and in effect ruled that the privilege was not available to the spouse.

THE COURT: I think the record clearly shows what happened here and I think the record justifies me letting the Government use this statement and I'm doing it; as I stated, she says it's true. *I'm convinced the girl is frightened and that for some reason or other which I'm not going to try to dig out of her, she's not going to testify. I'm convinced the second marriage was purely for the purpose of allowing her to take, claim the privilege of a wife. She has told me that if I force her to she'll testify, but I don't want to do that.* I don't think I should under the circumstances. We're going to use this alternative . . .. (emphasis supplied)

At the close of the hearing, defense counsel informed the Court that the defendant objected to the admission of the statements into evidence. The Court and Government agreed that under the circumstances no further objection would be necessary when the statements were actually admitted into evidence.

The jury was then seated and portions of the statements were read to them by the ATF agents.

On appeal, the appellant contends that the Court erred in allowing the statements to be read into evidence. Specifically, appellant argues that the statements were not admissible under the Federal Rules of Evidence, and, if they were admissible, the introduction of this admittedly hearsay testimony violated his Sixth Amendment confrontation rights.

The Government contends that the statements were admissible under Rules 804 or 803 of the Federal Rules of Evidence and that no confrontation rights of the defendant were infringed.

We conclude that the statements in view of the findings of the trial court, were inadmissible under the Federal Rules of Evidence and reverse on that basis. We consider it unnecessary to decide whether or not the defendant's confrontation rights were infringed.

In this case, there is no doubt that the statements constituted hearsay testimony. Rule 802 of the Federal Rules of Evidence states that "[h]earsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress." The Government has not proffered and the Court is not aware of any authority outside the Federal Rules of Evidence which would authorize the admission of the statements into evidence. If the statements were properly admitted, then authority for such must be found within the Federal Rules of Evidence.

Rule 804(a)(1) of the Federal Rules of Evidence states that:

Unavailability as a witness includes situations in which the declarant—(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement, . . .

Rule 804(b)(5) states that "[T]he following are not excluded by the hearsay rule if the declarant is unavailable as a witness:"

(5) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party suffi-

ciently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

At the outset, we again emphasize that the trial judge did not find that a valid spousal privilege existed, but rather that the second marriage was a sham.

■ It is well established that an exception to the husband-wife privilege exists if the trial judge determines that the marriage is a fraud. *Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *United States v. Apodaca,* 522 F.2d 568 (10th Cir. 1975). Therefore in this case, the trial judge could have ordered her to testify. Not having a valid privilege, she was an available witness. While there is authority supporting the view that the witness who erroneously asserts a privilege and refuses to testify is rendered unavailable, Fed. Rules Evidence, Rule 804(a)(2), 28 U.S.C., *United States v. Mobley,* 421 F.2d 345 (5th Cir. 1970); Weinstein and Berger, *Evidence* ¶ 804(a)[01], this was not such a case. The witness explicitly stated that if she was ordered to testify, she would not refuse to do so. Thus we conclude that the witness was available and hold that the statements were not admissible under Rule 804.

At oral argument, it was argued that the statements were admissible under Rule 803(24) which it is contended declares availability to be immaterial.

Rule 803(24) states as follows: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(24) *Other exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through rea-

sonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

■ In order for evidence to be admitted pursuant to Rule 803(24), five conditions must be met. These are:

(1) The proponent of the evidence must give the adverse party the notice specified within the rule.

(2) The statement must have circumstantial guarantees of trustworthiness equivalent to the 23 specified exceptions listed in Rule 803.

(3) The statement must be offered as evidence of a material fact.

(4) The statement must be more probative on the point for which it is offered than any other evidence the proponent can procure through reasonable efforts.

(5) The general purposes of the Federal Rules and the interests of justice must best be served by admission of the statement into evidence.

In this case, it is not disputed that proper notice was given, that the statements possessed the required circumstantial guarantees of trustworthiness, and that the evidence was highly material. However, the remaining conditions of admissibility were not met.

■ The live testimony of the available witness, whose demeanor the jury would have been able to observe and whose testimony would have been subject to cross-examination, would have been of more probative value in establishing the truth than the bare statements transcribed by the ATF agents. *See California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970);

*United States v. Williams,* 447 F.2d 1285 (5th Cir. 1971); *United States v. Lynch,* 163 U.S.App.D.C. 6, 499 F.2d 1011 (1974). Unlike the case in which the witness takes the stand, the use of the statements foreclosed any exploration of weaknesses in the witness' perception, memory, and narration of the matters asserted within the statements. While it has been contended that availability is an immaterial factor in the application of Rule 803(24), this argument is wide of the mark. Although the introductory clause of Rule 803 appears to dispense with availability, this condition re-enters the analysis of whether or not to admit statements into evidence under the last subsection of Rule 803 because of the requirement that the proponent use reasonable efforts to procure the most probative evidence on the points sought to be proved. Rule 803(24), thus, has a built-in requirement of necessity. Here there was no necessity to use the statements when the witness was within the courthouse. The trial court erred in overlooking this condition of admissibility under Rule 803(24).

Likewise, we readily conclude that the "purposes of these rules and the interests of justice" were not served by the admission of the statements into evidence.

 In both civil and criminal cases, our common law heritage has always favored the presentation of live testimony over the presentation of hearsay testimony by the out-of-court declarant. *See* McCormick, Evidence 2d § 244. The jury's observation of the demeanor of the witness and the effectiveness of cross-examination in the discovery of the truth are the traditional reasons for the preference even though the out-of-court statement had been given under oath. *See California v. Green, supra.* The assumption which underlies the hearsay rule is that the reliability of statements made in the courtroom may be better made to appear than a second hand recitation of those uttered out of court. *United States v. Williams, supra; United States v. Lynch, supra.*

 Rule 803(24) was designed to encourage the progressive growth and develop-ment of federal evidentiary law by giving courts the flexibility to deal with new evidentiary situations which may not be pigeon-holed elsewhere. Yet tight reins must be held to insure that this provision does not emasculate our well developed body of law and the notions underlying our evidentiary rules. The trial court's ruling would lead down the later impermissible path. The ruling was not in harmony with the general purposes of the Federal Rules.

The legislative history to Rule 803(24) is particularly instructive in this regard.

> It is intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances. The committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in Rules 803 and 804(b). The residual exceptions are not meant to authorize major judicial revisions of the hearsay rule, including its present exceptions . . . . ."

Fed. Rules Evid. Rule 803, 28 U.S.C.A. Historical Note.

In the criminal case, let it not be forgotten that there is an added consideration to be given weight in favor of the preference for live testimony. This consideration flows from the Sixth Amendment right of confrontation.

While we do not find it necessary to premise our decision on this ground, suffice it to say that we have grave doubts that these rights of the defendant were not denied. *See Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Stewart v. Cowan,* 528 F.2d 79 (6th Cir. 1976).

As a final matter, we wish it to be understood that we deplore as greatly as the trial judge the tactics of sham marriages and intimidation of witnesses. Yet our law provides methods to alleviate these deplorable practices other than through interpretations

.. 

## 300

of evidentiary rules which may seem to be fair in a particular case yet establish an impermissible legal precedent for subsequent cases.

REVERSED.