**Phillip Charles VANCE, Plaintiff,**

v.

**Bob RICE, et al., Defendants.**

**Civ. No. 81–432–C.**

United States District Court,
S. D. Iowa, C. D.

Oct. 30, 1981.

Roger P. Owens, John C. Wellman and John J. Piazza, Des Moines, Iowa, for plaintiff.

Dan L. Johnston, Polk County Atty., James A. Smith, Asst. Polk County Atty., Des Moines, Iowa, for defendant.

## RULING AND ORDER

STUART, Chief Judge.

The Court has before it plaintiff's application seeking a court order prohibiting the defendants from interfering with his efforts to marry Monica Halsey and declaring that defendants have a constitutional obligation to afford Vance the right to have his marriage solemnized. Counsel for both sides presented arguments and submitted sealed exhibits at an October 27, 1981, hearing on plaintiff's application. As noted in a September 25, 1981, Order, the Court elects to treat plaintiff's application as one for final, rather than preliminary, injunctive relief, inasmuch as any preliminary relief granted would have the same permanent effect as final injunctive relief.

### I. Facts.

Phillip Charles Vance, the plaintiff in this case, is charged in the Polk County Iowa District Court with seven criminal charges growing out of the robbery of a Drug Town store in Ankeny, Iowa. During the robbery three persons were bound and shot at close range, although none were killed. On June 19, 1981, Vance was arrested in connection with the above charges and has been held as a pretrial detainee since. Monica Halsey, with whom Vance had been living for about two years and who is expecting their child between November and January, was also taken into custody as a material witness. On June 23, a statement was obtained from Halsey by officers from the Iowa Division of Criminal Investigation in the presence of her attorney and an assistant county attorney. Subsequent thereto, Vance stated to county officials that he wanted to marry Halsey. On August 21, 1981, her deposition was taken to preserve her testimony and she was released on bond. Also on that date, a valid marriage license was issued to Vance and Halsey and the required blood tests were taken. At that time, Vance and Halsey had satisfied all prerequisites to the performance of a marriage ceremony. On September 4, Vance's counsel requested the chief Polk County jailer to allow them to be married before September 10, 1981, the day the marriage license expired. The request was denied on the advice of the Polk County Attorney's Office and Iowa District Court Judge Rodney Ryan.

This action was filed the same day under the Civil Rights Statute, 42 U.S.C. § 1983. Vance alleges that he has been deprived, under the color of law, of rights secured by the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution because state officials have refused to allow the marriage. Vance's application for a temporary restraining order, which requested affirmative relief, was denied by this Court, after hearing, on September 8, 1981. On September 25, 1981, the Court denied defendants' motion to dismiss and set the matter down for hearing on the request for preliminary and permanent injunctive relief.

On October 26, 1981, Judge Ryan, upon the application of the Polk County Attorney's Office, issued a temporary restraining order prohibiting the clerk's office from issuing another marriage license to Vance and Halsey and prohibiting them from mar-

rying until after Halsey had given her testimony at Vance's trial. A hearing on an injunction based upon this temporary restraining order was scheduled for October 30, but continued until November 6, 1981.

The matter came on for hearing before this Court on October 27. After receiving evidence, hearing statements of counsel and reviewing the briefs, the Court denies plaintiff's application for a preliminary and permanent injunction and declines to interfere with the injunctive proceedings now pending in the Polk County Iowa District Court.

## II. Issues.

In this case we are not dealing with a state's attempt to interfere directly and substantially with the right to marry by statute or regulation. We are here concerned with the action of a state judge and the county attorney preventing a specific pretrial detainee from marrying a material witness in the pending criminal matter in which he is a defendant. The Court does not consider Vance's status as a pretrial detainee to be a material factor.

The constitutional question can be framed in the following two ways:

(1) Does the defendant in a criminal case have a constitutional right to marry a material witness in his case when such marriage would render the witness incompetent to testify against him?

or

(2) Is a criminal defendant's constitutional right to marry violated when state officials prevent or prohibit his marriage to a material witness in his case until she has testified at trial?

## III. Analytical Framework.

Plaintiff's claim that defendants are violating his constitutional rights is based upon the United States Supreme Court's unequivocal recognition in *Zablocki v. Redhail*, 434 U.S. 374, 383–87, 98 S.Ct. 673, 679–81, 54 L.Ed.2d 618 (1978), of the "fundamental" character of the right to marry. *Accord, Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); *Skinner*

*v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). Vance claims that this fundamental constitutional right exists even if the marriage would have the effect of rendering a key witness in a major criminal trial incompetent to testify. *Redhail* does not support such a broad conclusion. It does not make marriage an absolute right. It recognizes that the marriage relationship has always been a matter of state law and is subject to reasonable regulation. *Id.* at 386, 98 S.Ct. at 681. There is, of course, a point beyond which state regulation cannot go without interfering with the constitutional rights of the parties. The Court in *Redhail* held that the Wisconsin statute, which prohibited any Wisconsin resident having minor issue not in his custody whom he is under obligation to support by court order from marrying without obtaining a court order to do so, violated the equal protection clause of the United States Constitution. However, the Supreme Court speaking through Justice Marshall stated:

> By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or the prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into a marital relationship may legitimately be imposed.
>
> *Idem.*

In this instance, the Court need not decide whether the action of state officials is such that the "rigorous scrutiny" standard would not apply. For the purposes of this Ruling, it will be assumed that standard is applicable.

Before the Court can conclude that defendants' actions do not unnecessarily infringe on plaintiff's fundamental right to marry, defendants must show (1) that the state interest they seek to promote is "compelling," (2) that their conduct actually furthers that interest, and (3) that no less intrusive alternative exists by which to advance that compelling state interest. *See*

*Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973) rehearing den'd 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694; *Dunn v. Blumstein,* 405 U.S. 330, 342–43, 92 S.Ct. 995, 1003–04, 31 L.Ed.2d 274 (1972); *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969).

### IV. The State Interest.

■ Vance is charged with several serious crimes. The circumstances indicate that the perpetrator of the crimes, whoever it might be, displayed an utter disregard for human life. The state and the public have an important interest in the apprehension, prosecution and punishment of the perpetrator.·

A lawsuit is a search for the truth. It is an elusive goal, at best, but evidence which aids the fact finder in reaching that goal should ordinarily be admitted. It could very well be that a criminal defendant, by marrying a key witness and thereby foreclosing the use of her testimony, could so weaken the case against him, that he, even if guilty, would be able to escape punishment and thwart justice. Seeing justice done is the ultimate goal of the judicial process. The Court is of the opinion that the state's interest in having all relevant evidence before the fact finder commands great respect and deference as a part of the foundation of our criminal justice system. A fact finder deprived of relevant facts may reach a conclusion compelled by logic, yet not by justice. If our judicial system regularly meted out injustice, it would not long be tolerated.

> The whole life of the community, the regularity and continuity of its relations, depends upon the coming of the witness. Whether the achievements of the past shall be preserved, the energy of the present kept alive and the ambitions of the future be realized depends upon whether the daily business of regulating rights and redressing wrongs shall continue without a moment's abatement, or shall suffer a fatal cessation. The business of the particular cause is petty and personal, but the results that hang upon it are universal. All society, potentially, is involved in each individual case. The vital process of justice must continue unceasingly. A single cessation typifies the prostration of society. A series would involve its dissolution. The pettiness and personality of the individual trial disappear when we reflect that our duty to bear testimony runs not to the parties in that present cause, but to the community at large and forever.

8 J. Wigmore, Evidence § 2912, at 72–73 (McNaughton rev. 1961).

However, the legislative branch has from time to time carved out a few, but highly significant, exceptions to the general rule that the fact finder should have all relevant evidence before it. Exceptions, such as the physician-patient, priest-penitent, and attorney-client privileges, represent a considered legislative judgment that the public interest in having all relevant evidence presented to the fact finder is subordinate to some other important public interest. *See Elkins v. United States,* 364 U.S. 206, 234–35, 80 S.Ct. 1437, 1454–55, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting.)

Although its sweep is much broader than the privileges just mentioned, *Trammel v. United States,* 445 U.S. 40, 51–52, 100 S.Ct. 906, 913–914, 63 L.Ed.2d 186 (1980), Iowa Code section 622.7, the spousal competency statute, represents such a judgment. As was the case in many other states, *see* 445 U.S. at 43–46, 100 S.Ct. at 909–910, the Iowa legislature adopted a statutory provision rendering one spouse incompetent to testify against the other, with some exceptions. Iowa Code § 2391 (1851) (current version found at Iowa Code § 622.7). The ostensible goal of these spousal competency statutes was to preserve some semblance of marital harmony for civil and criminal litigants. *Rankin v. Taylor,* 204 Iowa 384, 385, 214 N.W. 725, 726 (1927); *see generally* 8 J. Wigmore, Evidence § 2228 (McNaughton rev. 1961). Down through the years, many states apparently revised their judgments as to the relative importance of the interests promoted and thwarted by spousal competency statutes. The result has been a

trend toward abolishing or severely limiting such statutes. 445 U.S. at 48–50, 100 S.Ct. at 911–912. Iowa, however, is one of eight states which still forbid one spouse to testify against the other, with some exceptions not relevant here. *Id.* at 48, n.9, 100 S.Ct. at 911, n.9.

The Court is of the opinion that, while the legislative policy choice embodied in Iowa Code section 622.7 is relevant in assessing the weight to be accorded the state interest asserted by defendants in the above-captioned action, that policy choice is by no means determinative. Although the legislature probably recognized that the price of preserving litigants' marital harmony would be the loss of some relevant testimony, *see generally* 8 J. Wigmore, Evidence § 2912 (McNaughton rev. 1961), the Court is of the opinion that it would be unreasonable to infer a legislative intent to prohibit state officials from preventing an accused from marrying a prosecution witness in the time between the filing of criminal charges and the trial, when such a marriage would allow the accused to reap the exclusionary benefits of section 622.7.

The circumstances would be entirely different if the parties were already married. The public policy concerned with the preservation of marital harmony would then be superior to the public's "right to every man's evidence," 364 U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669 (Frankfurter, J., dissenting), under the policy judgment embodied in section 622.7. However, because Vance and Halsey are not married, the state's interest in having its courts do justice prevails over any competing policy considerations related to the right to marry.

Marriage, of course, should be encouraged. The Court is not unmindful that the testimony of Ms. Halsey at Vance's trial may well have a negative effect upon their future relationship. Nor has the Court ignored the complications presented by the impending birth of their child and the fact that the parties have lived together for two years. However, these considerations do not implicate the same legislative concerns for marital harmony as would an existing marriage.

The Court's understanding of the legislative intent underlying section 622.7 convinces it that the state's interest in having all relevant evidence presented to the fact finder is not subordinate to any other public policy, in the circumstances presented by the above-captioned action. Accordingly, the Court is of the opinion that the state interest asserted by defendants satisfies the "compelling state interest" requirement of the traditional "strict scrutiny" approach.

## V. Relationship Between Means and End.

The next issue is whether the means employed by the state officials promote to some degree the state's compelling interest. The Court is of the opinion that the actions of the state officials further this legitimate and compelling interest of the state. Clearly, the public interest in justice would not be served by the officials allowing the solemnization of a marriage which would deprive the criminal prosecution of material evidence.

## VI. Alternatives.

The final question is whether the means employed by defendants to further the state's compelling interest are the means which least infringe on plaintiff's right to marry.

Defendants' choice of means has meant that plaintiff and Ms. Halsey have been temporarily deprived of all the benefits which normally attend a valid marriage. Defendants' proposed approach would perpetuate that deprivation until after Ms. Halsey has testified in plaintiff's criminal trial. After that time, defendants apparently would have no major objections to the marriage.

During this time, a period of obvious personal trauma, plaintiff will be deprived of that added degree of emotional security inherent in a valid marriage. *Cf. Johnson v. Rockefeller*, 365 F.Supp. 377, 381–82 (S.D.N.Y.1973) (Lasker, Jr., concurring in part and dissenting in part), *aff'd sub nom. Butler v. Wilson*, 415 U.S. 953, 94 S.Ct. 1479, 39

L.Ed.2d 569 (1974), (intangible benefits of marriage exist notwithstanding one spouse's life imprisonment). Moreover, Ms. Halsey's anticipated delivery date encompasses, in part, the scheduled period of plaintiff's criminal trial. Thus, postponing the marriage increases the risk that the couple's child will be born illegitimate, even though a subsequent marriage would legitimize the child. See Iowa Code § 595.18. Further, and of primary significance, the absence of an existing marital relationship between plaintiff and Ms. Halsey at the time of trial will render any attempts to invoke the exclusionary provisions of section 622.7 ineffective, on the record developed here.

This nonexhaustive list of benefits which plaintiff would lose in the event that the marriage is postponed illustrates the fact that temporarily blocking the marriage will deprive plaintiff of more marital benefits than just those conferred by the spousal competency statute. Is there a less intrusive means by which to ensure that the trier of fact will be allowed to consider Halsey's testimony and satisfy the state's compelling interest?

The first alternative would be for Vance to permit Halsey's deposition testimony to be used, if he is allowed to marry the deponent. Plaintiff, however, is unwilling to do so.

A second conceivable approach might be to let plaintiff and Halsey get married before trial and require the state to seek the admission of her deposition testimony under an "unavailability" exception to the hearsay rule. Cf. Fed.R.Evid. 804 (federal exceptions to the hearsay rule based on "unavailability"). The Iowa Supreme Court apparently has not addressed the issue whether invocation of the spousal competency statute renders the spouse "unavailable" for purposes of admitting her premarital deposition. However, at least one other court has recently answered that question in the negative. See State v. Jaques, 256 N.W.2d 559 (S.D.1977) (South Dakota has since abolished the spousal competency statute. See S.D.Comp.Laws Ann. §§ 19–13–1, 19–13–12 to 19–13–15 (1979)); contra, Simms v. State, 492 P.2d 516 (Wyo.1972); Commonwealth v. DiPietro, 373 Mass. 369, 367 N.E.2d 811 (1977). In view of the doubt surrounding the question, the Court is unwilling to regard this suggested approach as a viable alternative, despite its arguably less intrusive nature.

Another conceivable approach is the one advanced by plaintiff's counsel at the October 27 hearing. Plaintiff suggests that the least intrusive scheme would allow him to marry Halsey immediately. Plaintiff would then force the state to show in the state trial court that the marriage was a "sham". If the state could demonstrate that the marriage was a "sham", then, plaintiff contends, Vance could not invoke the spousal competency statute's exclusionary benefits. The "sham" marriage doctrine has been endorsed in numerous decisions. See, e. g., United States v. Saniti, 604 F.2d 603, 604 (9th Cir. 1979), cert. den. 444 U.S. 969, 100 S.Ct. 461, 62 L.Ed.2d 384 (1979); United States v. Mathis, 559 F.2d 294, 298–99 (5th Cir. 1977); United States v. Apodaca, 522 F.2d 568, 571 (10th Cir. 1975). Plaintiff contends that such an approach would be less intrusive because a determination that the marriage is a "sham" would only deny Halsey and him the benefits of section 622.-7, and would not affect their enjoyment of all other benefits attending a legal marriage. Plaintiff argues that not only would such an approach avoid heavy-handed interference with plaintiff's fundamental right to marry, but it would also be in keeping with the long-recognized practice of leaving issues of witness competency up to the trial court's determination. State v. Teager, 222 Iowa 391, 401–02, 269 N.W. 348, 353 (1936).

However, the Court is of the opinion that plaintiff's suggested approach, like the "unavailability" approach, does not constitute a viable alternative. Although the Court has found no Iowa case squarely holding that there is no "sham" marriage exception to section 622.7, dicta in Iowa cases hints strongly that Iowa does not adhere to the "sham" marriage exception doctrine. See State v. Levy, 160 N.W.2d 460, 464–66

(Iowa 1968); *State v. Chrismore*, 223 Iowa 957, 959–61, 274 N.W. 3, 4–5 (1937).

Thus, the Court concludes that it is highly improbable that the prosecution would be allowed to invoke the "sham" marriage doctrine before the state trial court in the likely event that plaintiff opposed any attempt to put his bride on the stand. In short, the alternative promoted by plaintiff is no alternative at all.

Accordingly, the Court is of the opinion that no less restrictive alternative to the methods sought to be employed by defendants is available to effect the state's compelling interest in the production of Halsey's testimony at trial.

### VII. Conclusion.

If a prospective witness can be kept in custody as a material witness without violating his or her express constitutional right to liberty, *see Stein v. New York*, 346 U.S. 156, 184, 73 S.Ct. 1077, 1092, 97 L.Ed. 1522 (1953); *but see* Carlson, "Jailing the Innocent: the Plight of the Material Witness," 55 Iowa L.Rev. 1, 10–15 (1969), surely the state can impinge upon the rights of a defendant and a material witness to marry so that the material witness' testimony will be available at trial. The power to render a material witness incompetent should not be placed in the hands of a defendant in the name of a constitutional right to marry. The Court believes that the acts of the state officials sought to fulfill legitimate and substantial interests of the state and the public and that those actions did not unnecessarily impinge upon Vance's right to marry.

The Court is of the opinion that plaintiff's application for preliminary and permanent injunctive relief and for declaratory relief should be, and hereby is, denied.

IT IS THEREFORE ORDERED that plaintiff's application for injunctive and declaratory relief is denied.

IT IS FURTHER ORDERED that the Clerk enter judgment dismissing the above-captioned action with prejudice.