# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 2, 2014

Lyle W. Cayce
Clerk

No. 12-20707

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MICHELLE TURNER,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:09-CR-421

Before HIGGINBOTHAM, DAVIS, and HAYNES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:[*]

Michelle Turner appeals from her sentence of 24 months imprisonment followed by three years of supervised release after being convicted by a jury on all four counts of her Second Superseding Indictment.   We AFFIRM.

## I.      Factual Background

Turner and co-defendants Clifford Ubani, Princewill Njoku, Rolondae Mitchell-Slaughter, Mary Ellis, and Ana Quinteros were charged in a multi-count Superseding Indictment on October 14, 2009, with conspiring to commit

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-20707

health care fraud in violation of 18 U.S.C. § 1349, along with a criminal forfeiture allegation. Pursuant to plea agreements, several of the other co-defendants, including Ubani, pleaded guilty to criminal charges. Turner and Ellis proceeded to a jury trial, at which the government called Ubani as a witness. Turner made a motion for a judgment of acquittal during the trial, but the district court reserved ruling on it. Following trial, the jury acquitted Ellis but could not reach a unanimous verdict as to Turner. The district court declared a mistrial. Turner renewed her motion for a judgment of acquittal, and the district court denied it.

On March 15, 2011, a four-count Second Superseding Indictment charged Turner with one count of conspiring to commit health care fraud, one count of conspiring to receive health care kickbacks, and two substantive counts of receiving health care kickbacks, along with a criminal forfeiture allegation. The case was tried before a jury in a four-day trial which began on February 21, 2012. At the close of the government's case, Turner made a motion for a judgment of acquittal, arguing that the evidence was insufficient to convict her. The district court denied the motion.

Turner did not present a defense case. Without attempting to call Ubani as a witness, she attempted to introduce Ubani's sworn testimony from the first trial under the residual exception to the hearsay rule under Fed. R. Evid. 807, not the former testimony exception under Fed. R. Evid. 804(b)(1). The district court excluded the testimony under the residual exception because the testimony ordinarily would be subject to the prior testimony exception under Rule 804(b)(1), but Turner had failed to show that Ubani was unavailable to testify. Thus, Turner introduced no evidence in defense.

The jury found Turner guilty on all four counts, and the district court sentenced her to 24 months of imprisonment, followed by three years of

No. 12-20707

supervised release.    She was also ordered to pay restitution of $295,542.43, being held jointly and severally liable with her coconspirators.

## II.    Jurisdiction

The district court had jurisdiction over the criminal proceeding pursuant to 18 U.S.C. § 3231, and we have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## III.    Sufficiency of the Evidence

We review "'preserved challenges to the sufficiency of the evidence de novo.'   We view both circumstantial and direct evidence 'in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict.'   In doing so, we ask 'whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[1]   A defendant's failure to properly preserve an insufficiency-of-the-evidence claim by specifying "the particular basis on which acquittal is sought so that the Government and district court are provided notice" results in review only "under the extremely narrow manifest-miscarriage-of-justice standard."[2]

The government argues that Turner failed to preserve her sufficiency claim as to at least Counts 3 and 4, relating to the substantive charges that she received health care kickbacks.   We need not reach that issue, however, because even under de novo review, the government presented ample evidence to support Turner's conviction on all four counts.   We address each count

---

[1] *United States v. Njoku*, 737 F.3d 55, 62 (5th Cir. 2013) (quoting *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012)) (citations omitted; alterations in *Njoku*).   *See also United States v. Vargas-Ocampo*, 2014 U.S.App. LEXIS 5575 (5th Cir. Mar. 26, 2014) (en banc), and *United States v. Delgado*, 672 F.3d 320 (5th Cir.) (en banc), *cert. denied*, 133 S. Ct. 525 (2012) (discussing standard of review for sufficiency of the evidence).

[2] *United States v. McDowell*, 498 F.3d 308, 313 (5th Cir. 2007).

below after setting out the general scheme alleged by the government and supported by evidence and testimony at trial.

### A. Fraudulent Scheme

Turner worked on behalf of certain companies that provided durable medical equipment ("DME") (e.g., wheelchairs and diabetic supplies) and other services to Medicare beneficiaries. These companies included Family Healthcare Services DME and Family DME, Inc. ("Family Companies"), which were owned at least in part by Clifford Ubani. To qualify as a Medicare provider, DME suppliers must agree to follow all applicable laws, rules, and regulations, including the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and meet other requirements, such as licensing and insurance.

Once approved as a provider, a DME supplier may be reimbursed 80% of the allowed amount for qualified equipment it provides to Medicare beneficiaries. The beneficiary is required to pay the remaining 20% of the allowed amount, and the DME supplier may not represent to a potential beneficiary that the DME is free. The only exception to the copayment requirement is when the beneficiary can prove, based on detailed financial information, that he or she cannot afford it.

To receive reimbursement the DME supplier is required to submit a claim form to Medicare certifying that the supplied equipment is medically necessary for the health of the patient, as reflected by a doctor's prescription and the DME supplier's knowledge of the medical criteria for the beneficiary. Medicare suppliers are prohibited from making unsolicited telephone contact with potential beneficiaries, and individuals are prohibited from receiving referral fees for directing patients to a DME supplier.

The government presented evidence that the Family Companies were a small operation that supplied a large number of so-called arthritis kits to

No. 12-20707

Medicare beneficiaries.   Each kit consisted of a back brace, a double shoulder brace, and sets of two braces for the knees, elbows, and wrists, plus two foot gauntlets or ankle braces, a heating pad, and arthritic gloves.   Multiple doctors testified that no single individual would require all of this equipment, i.e., it would not be medically necessary to supply an arthritis kit to any individual.   More than 90% of the Family Companies' business involved these medically unnecessary arthritis kits.   The companies on average billed Medicare $4,000 to $5,000 for each set and received a reimbursement of about $3,000 for each one.   From October 2007 to March 2009, the Family Companies submitted more than $1.1 million in claims and received more than $560,000.

In September 2008, Medicare inspected Family Healthcare Services DME and revoked the company's provider number because of the company's focus on medically unnecessary arthritis kits.   Shortly thereafter, Family DME, Inc. obtained a Medicare provider number and began operating essentially the same scheme out of the same office building.   In January 2009 Medicare inspected the Family DME, Inc. offices and revoked its provider number.   The FBI began an investigation, eventually leading to the indictment of Turner and other defendants.

## B. Sufficiency as to Count I—Conspiracy to Commit Health Care Fraud

Count I of the Second Superseding Indictment charged that Turner entered into a conspiracy, in violation of 18 U.S.C. § 1349, to commit health care fraud, in violation of 18 U.S.C. § 1347, by defrauding a health care benefit program affecting commerce, specifically Medicare.

> A conspiracy to commit health care fraud under 18 U.S.C. § 1347 requires that the fraud be the object of the conspiracy.   18 U.S.C. § 1349.   The conspirators

No. 12-20707

must "knowingly and willfully" execute a scheme "to defraud any healthcare benefit program" or "to obtain, [through false pretenses] any of the money or property owned by . . . any health care benefit program."  18 U.S.C. § 1347.  Conviction requires proof "that (1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose."  [*United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012).]  Circumstantial evidence can prove knowledge and participation.  *Id.*[3]

"The agreement between conspirators may be silent and need not be formal or spoken.  An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances."[4]  Section 1349 does not require the government to prove an overt act.[5]

The government presented evidence that Turner had worked for the Family Companies as a recruiter of Medicare beneficiaries for the arthritis kits and that she received $300 as a referral fee for each arthritis kit supplied.  In addition to the Family Companies, she had also worked for other DME and health care providers, and she had her own businesses, including SS&B Total Home Health.  She used her daughter and other teenagers, hired through SS&B, to solicit Medicare beneficiaries by telephone, then used information gained during those calls to bill for the arthritis kits.

---

[3] *Njoku*, 737 F.3d at 63.  *Njoku* involved a related company but not the same fraudulent scheme as this case.

[4] *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012) (internal citations and quotation marks omitted).

[5] *United States v. Jones*, 733 F.3d 574, 584 (5th Cir. 2013).

No. 12-20707

The evidence showed that Turner supplied the lists of potential beneficiaries for her teenage telemarketers to contact and coached them on how to market the kits. Specifically, she told them to inform potential beneficiaries that they were entitled to the kits for free, at no cost to them, and that the braces came as a kit but that they did not have to use all of them. The Family Companies rarely collected the required 20% copayment from beneficiaries, and the binder at the office full of purported hardship waivers did not contain the detailed financial affidavits required to document the beneficiaries' inability to pay. Moreover, although Medicare required any supplied DME to be fitted to a beneficiary, there was no evidence that patients were ever actually fitted. Instead, Turner's employees would fill out the forms based on a beneficiary's stated height and weight, and the kits were simply shipped to the beneficiary, often with no indication that the patient had even accepted delivery.

Before the Family Companies could bill Medicare for an arthritis kit, it needed a doctor's prescription. The government presented evidence that Turner would send a pre-filled prescription form to a beneficiary's primary doctor using the information her employees obtained through the telephone calls. This form required only the doctor's signature and included a cover letter indicating that the beneficiary had been evaluated by the doctor and that the patient had requested the kit and/or other medical equipment.

The government argued that Turner was depending on the doctors' inattentiveness to obtain prescriptions. It presented the testimony of doctors who had signed prescription forms but later discovered that they had not evaluated that patient, the patient had not requested the kit, the kit was medically unnecessary, and they would not have signed the form had they had paid attention to it. If a primary doctor refused to sign the prescription form,

7

Turner would refer it to one of the three house doctors associated with the Family Companies, who provided prescriptions for more than 70% of the claims.   Thus, the Family Companies were able to submit many claims that were not prescribed by a primary doctor.   Indeed, some beneficiaries testified at trial that they received kits that they did not want and never used.

During the FBI's investigation beginning in 2009, Turner voluntarily supplied documents to the FBI, including a file of "Approved DME Orders Family Healthcare," with documents listing her as the "Account Executive" responsible for securing prescriptions.   These showed 81 beneficiaries who were supplied the full arthritis kit.   Her files also showed more than 100 orders which had not yet been approved, some of which included notes from doctors specifically denying authorization.   At least one doctor stated that he was reporting Turner's company for a false request.

Turner argues that the government failed to present any evidence that she entered into an agreement to commit health care fraud.   In part, she argues that every claim submitted was signed by a doctor and therefore were valid orders under Medicare.   She is wrong.   The government presented overwhelming evidence on which a jury could conclude that she at least tacitly conspired to commit health care fraud.   Given Turner's role in coaching her telemarketers, her pre-filled prescription form scheme, the extensive use of house doctors, and the numerous denials of authorization by beneficiaries' primary doctors, the jury could easily infer that Turner made an agreement to defraud Medicare, that she "knew the unlawful purpose of the agreement," and that she entered into the agreement willfully.[6]   Thus, the evidence was sufficient to convict Turner of Count I.

---

[6] *Njoku*, 737 F.3d at 63.

No. 12-20707

## C. *Sufficiency as to Count II—Conspiracy to Receive Health Care Kickbacks*

Count II of the Second Superseding Indictment charged that Turner entered into a conspiracy, in violation of 18 U.S.C. § 371, to receive kickbacks, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1).

> A conviction of conspiracy under Section 371 requires the Government to prove: (1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy. The government must prove the same degree of criminal intent as is necessary for proof of the underlying substantive offense. Thus, in addition to proving an intent to further the unlawful objective, there must also be proof that the defendant acted willfully, that is, with the specific intent to do something the law forbids.[7]

The underlying substantive kickback offense under Section 1320a-7b(b)(1) is that Turner or her co-conspirators

> knowingly and willfully solicit[ed] or receive[ed] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--
>
> > (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> >
> > (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing,

---

[7] *Njoku*, 737 F.3d at 63-64 (internal citations and quotation marks omitted).

No. 12-20707

> leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .[8]

The statute also contains a safe harbor provision for bona fide employees,[9] which is addressed separately below.

Specifically, the Second Superseding Indictment charged that Turner conspired to receive commissions for referring Medicare beneficiaries to the Family Companies. The government presented documentary evidence that the Family Companies paid commissions for Medicare referrals under a document labeled "Independent Contractor's 10 Percent Commission," which established a $300 payment for referring a beneficiary who received an arthritis kit. The government also introduced email exchanges between Turner and Ubani which discussed her referrals for arthritis kits and the associated commissions. The government also introduced two checks written to Turner with the memo lines noting the provision of arthritis kits. These checks form the evidentiary basis of Counts III and IV, concerning the substantive charge that Turner received health care kickbacks.

The government presented evidence that Turner was sophisticated with respect to Medicare reimbursements and acted knowingly and willfully to violate the Anti-Kickback statute. Indeed, the government showed that she initially lied to an FBI agent, claiming that she was paid $30 to $50 per hour instead of acknowledging that she was paid referral commissions. The evidence amply demonstrated (1) that there was an agreement between Turner and other coconspirators to violate the Anti-Kickback Statute; (2) that Turner

---

[8] 42 U.S.C. § 1320a-7b(1).

[9] 42 U.S.C. § 1320a-7b(3)(B).

knew of the unlawful objective and voluntarily joined the conspiracy; and (3) that there was an overt act, namely Turner's knowing and willful receipt of kickbacks in the form of Medicare referral commissions, as well as the Family Companies' payment of same.   Thus, there was sufficient evidence to support the jury's verdict on Count II.

### D. Sufficiency as to Counts III and IV—Receipt of Health Care Kickbacks

Turner also challenges her conviction on the substantive charges that she violated the Anti-Kickback Statute, 42 U.S.C. § 1320a7-b(b)(1).   The elements are already set out above.   Again, the government presented sufficient evidence on which the jury might convict.   Count III of the Second Superseding Indictment charged that Turner received a check dated November 10, 2008 in the amount of $2,100 with the notation "three skill + Artho kits 3" on the memo line, and Count IV charged that Turner received a check dated March 5, 2009 in the amount of $1,200 with the notation "Arto [sic] Kits supplies" on the memo line.   The government presented evidence that these amounts and the memo lines conformed to the Family Companies' internal document titled "Independent Contractor's 10 Percent Commission," which established the kickback schedule.   This evidence, coupled with the other evidence the government presented at trial, fully supports a finding that Turner "knowingly and willfully solicit[ed] or receive[ed] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind," in return for Medicare referrals.[10]

### IV.   Safe Harbor Instruction

Turner argues on appeal that, with respect to Counts III and IV, the

---

[10]  42 U.S.C. § 1320a-7b(1).

district court erred in failing to instruct the jury about the safe harbor provision in the Anti-Kickback Statute, which exempts from liability "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services."[11]    The safe harbor provision is an affirmative defense which the defendant must prove, and a defendant who fails to present evidence supporting the defense is not entitled to the jury charge.[12]    "A district court's jury instructions are reviewed for abuse of discretion, considering whether the instruction, taken as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.    Any error is subject to harmless error review."[13]

Here, Turner did not present a defense case, and on appeal, she makes a conclusory assertion that the evidence presented by the government proves that she was merely an employee of the Family Companies.    Turner does not point to any relevant evidence concerning her employee status.    Though she points to the fact that she submitted referral forms, approved by doctors, to other workers associated with the Family Companies, that is irrelevant to the determination of her status as an employee or independent contractor. Because Turner failed to present any evidence in support of the safe harbor affirmative defense, the district court did not err in failing to include the

---

[11] 42 U.S.C. § 1320a-7b(3)(B).

[12] *See, e.g., United States v. Robinson*, 505 F. App'x 385, 387-88 (5th Cir. 2013) (The defendants were not entitled to safe harbor defense where, among other things, they were paid a fee or commission for Medicare beneficiary referrals; they did not receive regular paychecks, only referral payments; they received no training or direction from the alleged employer; they obtained their own leads and sources for referrals; and they were not required to keep regular office hours.).

[13] *United States v. Aldawsari*, 740 F.3d 1015, 1019 (5th Cir. 2014) (internal quotation marks and footnotes omitted).

No. 12-20707

instruction.

## V.     Clifford Ubani's Testimony

Turner argues that the district court erred in refusing to admit portions of Ubani's testimony from when he appeared as a government witness in Turner's prior mistrial.   Ubani's prior testimony was unquestionably hearsay because neither Turner nor the government called Ubani as a witness in the second trial, and Turner sought to introduce his testimony for the truth of his statements.[14]   Turner expressly sought to introduce the testimony under the residual exception to the hearsay rule, Fed. R. Evid. 807, *not* the former testimony exception, Fed. R. Evid. 804(b)(1).

Turner has a high bar to clear in seeking to reverse the district court's decision.   We review evidentiary decisions for abuse of discretion, subject to harmless error analysis if the district court abused its discretion.[15]   We have explained that Rule 807's residual "exception is to be 'used only rarely, in truly exceptional cases.'"[16]

> Given this high hurdle, in the decision as to whether to apply the residual exception "district courts are given 'considerable discretion,' and a court of appeals will not disturb the district court's application of the exception 'absent a definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors.'"[17]

---

[14]  Fed. R. Evid. 801(c).

[15]  United States v. Ricardo, 472 F.3d 277, 287 (5th Cir. 2006).

[16]  *United States v. Phillips*, 219 F.3d 404, 419 n.23 (5th Cir. 2000) (quoting *United States v. Thevis*, 665 F.2d 616, 629 (5th Cir. 1982)).

[17]  *Id.* (quoting *United States v. Loalza–Vasquez*, 735 F.2d 153, 157 (5th Cir. 1984) (quoting *Page v. Barko Hydraulics*, 673 F.2d 134, 140 (5th Cir. 1982)).

Fed. R. Evid. 807 provides:

> (a) **In General**. Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:
>
>> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
>>
>> (2) it is offered as evidence of a material fact;
>>
>> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
>>
>> (4) admitting it will best serve the purposes of these rules and the interests of justice.
>
> (b) **Notice**. The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.[18]

Here, although the fact that Ubani's prior testimony was sworn means that it is likely trustworthy under Rule 807(a)(1), and Turner is certainly offering Ubani's testimony as evidence of a material fact under Rule 807(a)(2). The prior testimony does not satisfy Rule 807(a)(3), however, because offering portions of Ubani's prior testimony from Turner's mistrial on more limited charges is *not* more probative than Ubani's live testimony would have been in this trial on four counts.[19] Although Rule 807 does not contain an explicit

---

[18] Fed. R. Evid. 807.

[19] *See, e.g.*, *United States v. Mathis*, 559 F.2d 294, 298 (5th Cir. 1977) ("The live testimony of the available witness, whose demeanor the jury would have been able to observe and whose

requirement that the declarant be unavailable, it still requires the proponent of the hearsay to undertake reasonable efforts to get better evidence, and Rule 807(a) only applies if another exception does not.

Here, Turner has not pointed to any reasonable efforts to obtain Ubani's live testimony. Indeed, Turner's counsel argued that because she was relying on the residual exception only, there was no need to even determine whether Ubani was available. That contradicts both the letter and spirit of the residual exception, which is intended to be a last resort.

Moreover, seeking to introduce Ubani's testimony from Turner's former trial would otherwise fall under the "former testimony" exception to the hearsay rule under Fed. R. Evid. 804(b)(1), which applies only if the declarant is unavailable. Turner cannot rely on Rule 807's residual exception to do an end run around Rule 804(b)(1)'s requirement that the witness be unavailable,[20] particularly where she has made no attempt to show that Ubani is unavailable. We cannot say the district court abused its discretion in refusing to admit Ubani's testimony under these facts.

---

testimony would have been subject to cross-examination, would have been of more probative value in establishing the truth than the bare statements transcribed by the ATF agents.").

[20] Applying the virtually identical former version of the residual exception, then Fed. R. Evid. 803(24), the panel in *Mathis*, *supra*, reasoned:

> While it has been contended that availability is an immaterial factor in the application of Rule 803(24), this argument is wide of the mark. Although the introductory clause of Rule 803 appears to dispense with availability, this condition re-enters the analysis of whether or not to admit statements into evidence under the last subsection of Rule 803 because of the requirement that the proponent use reasonable efforts to procure the most probative evidence on the points sought to be proved.

*Mathis*, 559 F.2d at 298.

No. 12-20707

## VI.    Rule 29 Motion for Judgment of Acquittal

Finally, Turner argues that the district court in her earlier mistrial erred in denying her motion for a judgment of acquittal based on the sufficiency of the evidence.    She is foreclosed from pursuing this argument by *United States v. Achobe*, 560 F.3d 259, 268 (5th Cir. 2008), in which we held that "where a first trial has ended in a mistrial due to a hung jury and a second trial leads to a conviction, the sufficiency of the evidence presented at the first trial cannot then be challenged on appeal."    Thus, the district court's denial of her motion stands.

## VII.   Conclusion

For the reasons set forth above, we AFFIRM.