John S. SMITH, Plaintiff-Appellee,

v.

NEW YORK LIFE INSURANCE COM-PANY, Defendant-Appellant.

No. 76-3170.

United States Court of Appeals,
Fifth Circuit.

Sept. 13, 1978.

---

**18.** See *Tisnado v. United States, supra,* at 455, n.3.

M. D. McLendon, H. Sanders Carter, Jr., Atlanta, Ga., J. Walker Harper, Augusta, Ga., for defendant-appellant.

Thomas R. Burnside, Jr., Thomas W. Tucker, Augusta, Ga., for plaintiff-appellee.

Before WISDOM, TJOFLAT and VANCE, Circuit Judges.

VANCE, Circuit Judge:

This is a diversity action seeking recovery on a policy of insurance issued by New York Life Insurance Company on the life of Malcolm A. Mauss. By assignment plaintiff became the owner and was named beneficiary of the policy.

On November 26, 1973 Mrs. Mauss applied for a $100,000.00 policy on her husband's life through Mr. W. B. Droubay, a field underwriter for New York Life. A medical examination was accomplished and submitted on December 12, 1973. A policy bearing a "policy date" and "date of issue" of January 7, 1974 was sent by New York Life to Mr. Droubay for delivery to the policyholder. The Mausses, however, had changed their minds about the amount of the coverage and asked Mr. Droubay to have the coverage amended to $75,000.00. On February 15, 1974 an application to amend was submitted along with the first month's premium. An amended contract bearing the same number as the original contract but reflecting the reduced amount and showing a "policy date" of January 25, 1974 [1] and a "date of issue" of February 27, 1974 was thereafter issued and delivered. Beginning as of January 25, 1974 and at all relevant times thereafter the premiums were paid.

On January 29, 1975 Mr. Mauss died. The coroner's report stated that the cause

---

1. The policy was backdated for ease of premium payment. Mr. Mauss wanted the premium drafted from his bank following deposit of his army retirement pay. The date selected facilitated that procedure.

of death was gastro-intestinal hemorrhage due to liver degeneration.[2]

Mr. Smith filed a proper death claim under the policy.[3] New York Life, however, discovered at some point that Mr. Mauss had been hospitalized for alcoholism and related conditions just prior to his application of November 26, 1973. The insured's medical history proved to be in serious conflict with information furnished in his application. Based on the misrepresentations in the Mauss application, New York Life attempted to rescind the policy and tendered a refund of premiums to Mr. Smith. Mr. Smith rejected the tender of premiums and filed suit to recover for the face amount of the policy, a bad faith penalty and attorney's fees.

New York Life asserted that the misrepresentations were material as a matter of law and made the contract of insurance void *ab initio*. Mr. Smith answered that such a defense was barred by the policy's incontestability clause[4] that provided,

18. Incontestability. This policy shall be incontestable except for nonpayment of premiums after it has been in force during the lifetime of the insured for one year from its date of issue.

In connection with this provision, it is New York Life's position that this court need go no further than the face of the $75,000.00 contract which reflects a "date of issue" of February 27, 1974. Since the insured died on January 29, 1975, use of this date would

result in the policy's not having been in force for one year from its "date of issue" (*i. e.,* February 27, 1974) at the time of Mr. Mauss' death. Under this argument the company is not barred from contesting the validity of the policy. Mr. Smith urges, however, that the policy sued on was merely an amendment of the original policy for $100,000.00 and therefore that the "date of issue" was January 7, 1974. In view of the compelling evidence of Mr. Mauss' misrepresentations, the outcome of the "date of issue" dispute is crucial.

The case was submitted to the jury on special interrogatories, the first of which with the jury's finding was as follows:

1. Do you find from a preponderance of the evidence that the insurance policy sued upon in this case was in force for at least one year from the date of its issue at the time of the death of Malcolm Mauss?

Yes
_____
Answer "Yes" or "No"

The jury further found that New York Life had acted in bad faith in refusing to pay John Smith the amount of the policy. On the basis of its findings, Smith was awarded $75,000.00, representing the face amount of the policy, along with a $500.00 penalty and $15,000.00 in attorney's fees.

The insurer contends that submission of the question to the jury was error because it is entitled to have its insurance contract

---

2. According to the Coroner and Chief Medical Examiner of the City and County of San Francisco, this was due to severe fatty degeneration and early metabolic cirrhosis of the liver. These findings are consistent with chronic alcoholism.

3. Smith was a creditor of Mr. Mauss. The assignment to Smith had been worked out by Mr. Droubay and with agreement of all parties after Mrs. Mauss became unable to make premium payments. Ownership of the policy wasn't actually transferred by New York Life to Smith until after the insured's death. This sequence gave rise to Mr. Smith's contention that the insurer had waived any misrepresentations. In view of our decision, it is not necessary that we treat that contention.

4. The purpose of an incontestable clause is to annul all warranties and conditions that might

defeat the right of the insured after the lapse of the stipulated time. *Equitable Life Assur. Soc. v. Florence,* 47 Ga.App. 711, 171 S.E. 317 (1933). An incontestable clause means exactly what it says; that is, it cuts off all defenses based on misrepresentations when the policy is not affirmatively repudiated within the contestable period. *Northwestern Mut. Life Ins. Co. v. Pickering,* 293 F. 496 (5th Cir. 1923), cert. denied, 263 U.S. 720, 44 S.Ct. 229, 68 L.Ed. 524 (1924); *Service Life Ins. Co. v. Weinberg,* 81 F.2d 359 (7th Cir. 1936); *Dorman v. John Hancock Mut. Life Ins. Co.,* 25 F.Supp. 889 (S.D. Cal.1939), aff'd., 108 F.2d 220 (9th Cir. 1939). *See, Great Southern Life Ins. Co. v. Russ,* 14 F.2d 27 (8th Cir. 1926); *Penn Mutual Life Ins. Co. v. Childs,* 65 Ga.App. 468, 16 S.E.2d 103 (1941).

enforced in accordance with its terms and because any required construction is solely a matter for the court and not for the jury. If the contract is clearly free of a conflict in its provisions and has no ambiguity resulting therefrom, the insurer's position is well taken. *Crowley v. Travelers Insurance Co.,* 196 F.2d 315 (5th Cir. 1952); *Byram v. Equitable Life Assurance Society of United States,* 180 F.Supp. 620 (W.D.La.1959), aff'd, 274 F.2d 822 (5th Cir. 1960). If it is not, however, defendant is hardly in position to complain about submission of the issue to the jury. Under controlling state law[5] the interpretation to be given the policy must be that most favorable to uphold the policy and provide the benefits for which the existence of the contract was intended. To whatever extent there is room for construction, the policy will be liberally construed in favor of that objective and provisions therein will be strictly construed against the insurer. *Penn Mutual Life Insurance Co. v. Childs,* 65 Ga.App. 468, 16 S.E.2d 103 (1941).[6]

Without question, parties to an insurance policy are free to strike any legal bargain they see fit. The term "date of issue" is not uniformly defined but has a fairly well understood meaning.[7] Although it is determined unilaterally by the insurer—it usually is the day that the policy document is generated—there is nothing wrong with using it as the trigger date for the one year during which the policy may be contested.

The controlling state statute[8] requires that policies be incontestable after two years. Within that period the parties are free to agree to any lesser period.

Appellee raises a serious question growing out of the rather unique historical background of New York Life policy 34–104–830. Specifically, is there any ambiguity in that policy with respect to the date on which the one year referred to in its incontestability clause begins to run? Resolution of the question requires a more detailed review of the evidence.

The original application for policy 34–104 830 was signed on November 26, 1973 by both Mr. and Mrs. Mauss and was an application for a $100,000.00 policy. An amendment to policy 34- 104–830 reduced the coverage to $75,000.00, and showed that the policy was to be dated January 25, 1974. The medical examination, on December 12, 1973, for the $100,000.00 policy was the only medical examination given to Mr. Mauss.

Policy 34 104–830 was originally issued on January 7, 1974. The amended policy, however, states "Policy Date January 25, 1974" at the top of its face sheet and near the bottom states "This policy is executed as of February 27, 1974 . . . which is its Date of Issue."

The policy was sold by New York Life field underwriter, Mr. Droubay, who testified in part as follows:

---

5. Under Georgia's choice of law rule, the validity, form and effect of insurance contracts are governed by the laws of the place where they are made under the principle of *lex loci contractus*. *Avemco Ins. Co. v. Rollins,* 380 F.Supp. 869 (N.D.Ga.), aff'd, 500 F.2d 1182 (5th Cir. 1974). This contract of insurance was made and delivered in Utah. The substantive law of Utah should control. The parties and the court below tried the case on the theory that Georgia law controls. There may be no difference of consequence. In any event this court holds the parties bound by theories of law on which they rely in the district court absent some manifest injustice. *Empire Life Ins. Co. of America v. Valdak Corp.,* 468 F.2d 330 (5th Cir. 1972).

6. Application of that familiar rule of construction in another circuit resulted in a holding that where an insurance application provided that

insurance was to be effective on a certain date but the policy was dated some months thereafter, the contestable period would start running from the earlier date. *Horwitz v. New York Life Ins. Co.,* 80 F.2d 295 (9th Cir. 1935).

7. This court has held that use of the term "date of issue" in an incontestability clause ordinarily refers to the date appearing on the face of the policy. *New York Life Ins. Co. v. Bullock,* 26 F.2d 666 (5th Cir. 1928). *Cf. Manufacturers Life Ins. Co. v. Capitol Datsun, Inc.,* 566 F.2d 354 (D.C.Cir.1977). We have recognized, however, that as with other contract provisions this clause is subject to resolution favoring the insured if any ambiguity exists. *American National Ins. Co. v. Motta,* 404 F.2d 167 (5th Cir. 1968).

8. *Ga.Code Ann.* § 56 2503(1)(b).

Q. And you worked up a proposal for him, and you took it out to his home and discussed it with him and got him to sign an application for insurance?

A. Yes.

. . . . .

Q. Now, that was an application for a hundred thousand dollars of life insurance, was it not?

A. Yes, sir.

. . . . .

Q. November 26th, 1973, was it not?

A. I think probably.

Q. And subsequent to taking that application, you had directed that he undergo a medical examination by a medical examiner approved by your company, did you not?

A. Yes.

. . . . .

Q. You submitted the application and medical data to the home office of the company, did you not?

A. Yes.

Q. And as a result of that, they issued a policy of insurance on the life of Mr. Mauss in the sum of a hundred thousand dollars, did you not?

A. Yes.

With reference to the amendment Mr. Droubay testified:

Q. They signed it themselves. Now, at the very top of that amendment to application, I note that the post's blocked, where it says, "The modifications apply to life policy (policy number, if known)" and then there is a blank, and you filled in a policy number. Where did you get that information, please?

A. That policy—that number corresponds with the original hundred thousand dollar policy which was issued by the company.

Q. And so it was your purpose then that life policy number 34104830 is what was being modified by the amendment?

A. Yes.

The monthly premium on the policy was $174.00 per month, and Mr. Droubay testified that the first premium paid on this policy covered the period from January 25, 1974 through February 25, 1974.

Even though the policy premiums were to be paid monthly, New York Life advanced field underwriter Droubay his commission for the first twelve months of the policy. If the policy had been rescinded in less than twelve months, he normally would have been required to refund a portion of the commission that he had been advanced. After the purported rescission in this case, however, the company determined that it would not require Mr. Droubay to refund any portion of the full year's commission.

With reference to the contestable period and the ultimate validity of the contract Mr. Droubay testified in part,

Q. Now, you were very surprised when you learned that your company had refused to pay Mr. Smith, were you not?

A. Yes, I was.

Q. And you advised your company that, in your opinion, it was a valid claim and ought to to be paid, did you not?

A. Yes.

. . . . .

Q. Isn't it true that when the inspector from your company—I believe Mr. Carroll—came out to talk with you after the death of Mr. Mauss, and after Mr. Smith had submitted his claim for the proceeds under this policy, didn't you call it to Mr. Carroll's attention that this policy was outside of the incontestable period, that the policy had been in force for more than twelve months since its date of issue and during the lifetime of the insured?

. . . . .

A. I told Mr. Carroll—and Mr. Carroll is an inspector employed by the company—I told him it was my understanding that the policy was beyond the contested period.

Mr. Briody, the company's senior claims analyst, identified several of the plaintiff's exhibits. One was a New York Life form which came from the local office under date of February 20, 1974 requesting a change in previously issued policy 34–104–830. That form indicated that the policy date was to be January 25, 1974, that the face amount was to be $75,000.00 and that the date for billing the policy was to be January 11, 1974. One of the forms identified by Mr. Briody shows a date of issue of January 7, 1974. Under its procedures this form would not have been generated in New York Life's home office unless the policy had been issued on that date.

Concerning the premiums on this policy, Mr. Briody testified,

Q. What is the amount shown of the premium on P–4?

A. It reflects amount suspended on account of first premium $174.00.

Q. I will ask you if that is the amount of the premium on the $75,000 policy or the amount of the premium on the $10,000 [sic] policy?

A. That is the amount of the monthly premium on the $75,000 contract.

With reference to the date of issue, the Briody testimony is as follows:

Q. I hand you what we have heretofore identified as P–28 and I will ask you when that policy was issued?

A. This would indicate that the policy was executed as of January 7th, 1974.

Q. Was that also its date of issue?

A. That would be the date of issue, yes, the date it was physically issued.

Mr. Briody outlined the history of the policy in an April 16, 1975 memorandum to Second Vice President Walsh, which was introduced as an exhibit:

The policy was issued January 7, 1974. Subsequently, under date of February 15, 1974, a form 4365 (money paid) requested modification of the policy to $75,000.00 with an effective date of January 25, 1974. The modified contract was issued on February 27, 1974.

Based on Mr. Droubay's records, another New York Life employee, Mr. Carroll, advised the home office that the contestable period ran out on January 25, 1975. The Mauss policy was approved by the insurer's underwriting only once, when it was originally submitted as a $100,000.00 policy. The records in that department reflect that the date of issue was January 7, 1974.

■ Under the controlling incontestability clause there are two initial dates that are relevant: (1) the date on which the policy goes "in force" and (2) the date of issue. They may be, but are not necessarily, the same. As we view the operation of this particular provision, both must precede the insured's death by at least a year.

Here, there seems to be no room for disagreement with respect to the first date. It was set by agreement between the insurer and the insured at January 25, 1974. The evidence clearly indicates that 12 premiums had been paid on the policy covering the period from January 25, 1974 through January 25, 1975. Premiums were applied for the first month of the policy, from January 25, 1974 through February 25, 1974, and the second monthly premium came due as of February 25, 1974. The face of the policy shows that the first monthly premium was due for the period January 25, 1974 through February 25, 1974 and that the policy became effective on the first of those dates. New York Life does not contend that the first premium was to be applied for any period other than the period from January 25 to February 25, 1974. Field underwriter Droubay was awarded a full year's commission for premiums on the policy. Conclusively the evidence is sufficient to support the affirmative answer of the jury that this policy was in force for at least one year during the lifetime of the insured.

Under the facts before us it is the second date that causes the difficulty.

■ The face sheet of policy 34–104–830 shows affirmatively that the date of issue for said policy was January 7, 1974. Droubay, who sold the policy to the insured,

actually delivered the $100,000.00 policy to the insured at his home in Tooele, Utah, and thereafter returned the $100,000.00 policy of life insurance with an amendment form to reduce coverage to $75,000.00. The undisputed evidence from New York Life's personnel is that the change was handled by amending the existing policy rather than by voiding the existing policy and issuing a new policy. After its amendment, the policy bore the same policy number. The forms that were employed in making the change of amount were those used by New York Life to amend existing and previously issued policies. The underwriting approval that had been granted in December of 1973 was relied upon and new underwriting approval was not sought when the policy was amended. No new medical examination of the insured was required. The policy was actually billed to the Salt Lake City agency on January 11, 1974. With reference to whether the claim should be paid or denied, the insurer's senior claims analyst affirmatively acknowledged, "The policy was issued January 7, 1974." This statement was consistent with the insurer's other internal records except for the fact that the amended policy bore a date of issue of February 27, 1974.

The evidence supports the following findings: (1) there was a single contract of insurance between this insurer and the insured covering the life of Mr. Mauss; (2) the "date of issue" of the resulting policy was January 7, 1974, and there was never thereafter any request by the insured or express agreement of the parties that such date be changed; (3) the original policy was amended at the request of the insured to reduce its coverage from $100,000.00 to $75,000.00; (4) the insurer generated an amended contract on a separate paper to reflect the reduced amount; (5) the amended contract reflected a February 27, 1974 date of issue; (6) by agreement of both parties the insurance coverage became effective as of January 25, 1974; and (7) premiums were paid on behalf of the insured and received by the insurer beginning on January 25, 1974.

Was the "date of issue" within the meaning of the incontestability clause January 7, 1974 or February 27, 1974? Unless the contrary clearly appears we must give it that construction providing the benefits for which the existence of the contract was intended. If the contract is so construed, the evidence supports the following findings: (1) the policy was in force and effect for more than one year prior to the date of death; (2) the "date of issue" was at least one year prior to the date of death; and, therefore, as the jury found, (3) "the insurance policy sued upon in this case was in force for at least one year from the date of its issue at the time of the death of Malcolm Mauss." Under such construction, the insurer's defense was barred.

The last issue presented by New York Life involves the $500.00 penalty and the $15,000.00 in attorney's fees that were included in the award to Smith. Under Georgia law a penalty and attorney's fees are recoverable by an insured for the refusal of an insuror to pay on a covered loss if such refusal was in bad faith. Ga.Code Ann. § 56–1206. The term "bad faith," as used in this section, means any frivolous and unfounded refusal in law or in fact to comply with a demand of a policyholder to pay according to the terms of the policy. *Royal Insurance Co. v. Cohen*, 105 Ga.App. 746, 125 S.E.2d 709 (1962). If there is any reasonable ground for contesting the claim there is no bad faith and attorney's fees may not be awarded. *Progressive Casualty Insurance Co. v. West*, 135 Ga.App. 1, 217 S.E.2d 310 (1975).

When there is evidence that shows a reasonable or probable cause for denial of the claim Georgia holds that a trial judge commits error in submitting the issue of bad faith to the jury. *Whitlock v. Interstate Life & Accident Insurance Co.*, 112 Ga.App. 235, 144 S.E.2d 541 (1965). The following was stated in *Public Savings Life Insurance Co. v. Wilder*, 123 Ga.App. 754, 182 S.E.2d 536, 538 (1971), a misrepresentation case:

"Bad faith" as the term is used in § 56–1206 of the Georgia Insurance Code means any frivolous or unfounded refusal

to pay a claim. The gross discrepancies which appeared between those facts appearing in the plaintiff's signed application and those which investigation disclosed after the claim was made on the policy gave defendant good reason to take issue with the plaintiff. In our opinion the trial judge should have granted the motion [for directed verdict] and removed the issue from the case.

In another misrepresentation case, *Lincoln Life Insurance Co. of Georgia v. Anderson*, 109 Ga.App. 238, 136 S.E.2d 1, 2–3 (1964), the rule was stated in a syllabus by the court as follows:

> Where, in an action on a policy of life insurance, . . . a sharp jury issue is made as to whether the applicant gave false answers . . . to the questions on the application which was filled out by the company agent for him, and it appears that the answers were as to matters material to the risk and thus, if knowingly and falsely made were fraudulent, the company had reasonable grounds for contesting the claim and neither penalty nor attorney's fees could be awarded under Code Ann. § 56–1206.

The Supreme Court of Georgia has held that when the insurer is "justified in litigating the issue [it] cannot, as a matter of law, be liable for the statutory penalty for bad faith under Code Ann. § 56–1206." *State Farm Mutual Automobile Insurance Co. v. Bass*, 231 Ga. 269, 201 S.E.2d 444, 445 (1973). When a justiciable controversy is presented in Georgia courts, the insurer is entitled to a directed verdict on the attorney fee issue. *Allstate Insurance Co. v. Anderson*, 121 Ga.App. 582, 174 S.E.2d 591 (1970); *Still v. Metropolitan Life Insurance Co.*, 118 Ga.App. 832, 165 S.E.2d 896 (1968); *accord, Independent Life & Accident Insurance Co. v. Thornton*, 102 Ga.App. 285, 115 S.E.2d 835 (1960).

The sufficiency of the evidence in the district court is of course, a question governed by federal and not state law. *Planters Manufacturing Co. v. Protection Mutual Insurance Co.*, 380 F.2d 869 (5th Cir. 1967). The substantive issue, however, is controlled by the meaning given to Georgia's "bad faith" standard by the courts of that state.

 In the case before us it is clear beyond question that the insured made serious and material misstatements of fact on his application. A close question was presented as to the operation of the incontestability clause under the unusual facts of the case. There is no substantial evidence that the defense of the case by the insurer was frivolous or unfounded or without reasonable grounds. We conclude that New York Life was amply justified in litigating its liability. As a matter of law plaintiff was not entitled to a penalty and attorney's fee award because of the insurer's bad faith refusal to pay the claim.

The part of the judgment that awards the principal sum of $75,000.00 to plaintiff is affirmed. The award of $15,500.00 in penalty and attorney's fees is reversed, and judgment is here rendered for defendant as to such award.

AFFIRMED IN PART, REVERSED AND RENDERED IN PART.