SOUTHERN STONE COMPANY, INC.,
Plaintiff-Appellee,

v.

Sam SINGER and Thomas D. Moore,
Defendants-Appellants.

No. 80–7896.

United States Court of Appeals,
Fifth Circuit.*
Unit B

Jan. 11, 1982.

Stephen G. Gunby, Gower & Gunby, P.C., Charles A. Gower, Columbus, Ga., Jesse Bowles, Cuthbert, Ga., for defendants-appellants.

William B. Hardegree, Hatcher, Stubbs, Land, Hollis & Rothschild, Jerry A. Buchanan, Columbus, Ga., for plaintiff-appellee.

Before TUTTLE, RONEY and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

In this diversity case, appellee Southern Stone Company, Inc. ("Southern Stone") sought to pierce the corporate veil of a former client, S&M Materials Company, Inc. ("S&M"). In an earlier suit on account for S&M's purchase of Southern Stone's limestone rock, Southern Stone obtained a judgment in its favor. Southern Stone's attempt to collect on that judgment by levying upon S&M's property, money or other valuables proved fruitless. Consequently, Southern Stone brought this action against Thomas D. Moore, Sam S. Singer and Susan M. Singer, the officers, directors and shareholders of S&M, and against The Singer Company, a corporation wholly owned by Sam Singer at all times relevant to this action.

Southern Stone alleged that after the decision was made to discontinue S&M's failing business, the individual defendants continued to purchase through S&M as much Southern Stone lime as they could, with no plans ever to pay for it. At the same time, Southern Stone argued, the individual defendants selectively transferred S&M's assets to themselves, including S&M's accounts receivable for the sale of Southern Stone lime, without considering the need for payment of S&M's account

with Southern Stone. In addition, Southern Stone contended that the assets and business of S&M and The Singer Company were so commingled and confused that S&M should be treated not as a separate corporation, but merely as a branch of The Singer Company's operation. The jury returned a verdict in favor of Susan Singer and The Singer Company, but against appellants Sam Singer and Moore. We reverse and remand for a new trial as to Sam Singer's and Moore's liability because of the prejudicial effect of the erroneous admission of a letter written by Southern Stone's counsel to Moore.

## I. FACTS

In 1974, Sam Singer helped his daughter, Susan Singer, and her fiancé, Moore, to organize S&M. Susan Singer and Moore each held 49% of S&M's stock and Sam Singer held 2%. Sam Singer was S&M's president and chairman of the board and made most of the major decisions affecting S&M. Moore was S&M's vice president and managed S&M's daily operations. Susan Singer was S&M's secretary-treasurer and kept S&M's books for awhile. Part of S&M's business was the hauling and selling of agricultural lime purchased from Southern Stone.

Apparently, S&M never was a particularly profitable operation. In an effort to keep the company afloat, Sam Singer continually loaned funds to S&M through The Singer Company. In the spring of 1976, however, The Singer Company itself was denied a sizeable bank loan because of the financial drain on the company caused by its unprofitable operations, including its relationship with S&M. The bank advised Sam Singer to eliminate his losing businesses and to inject new capital into The Singer Company. In June 1976, in apparent compliance with this advice, Sam Singer obtained for The Singer Company S&M's pledge of all its assets, including future accounts receivable for S&M's sale of lime. In November and December 1976, S&M continued to purchase lime on account from Southern Stone. S&M ceased operations on December 31, 1976.

After S&M stopped doing business, Moore started his own corporation, TM, Inc. ("TM"), in order to continue in the business of hauling and selling lime purchased from Southern Stone. This new corporation eventually ran up a sizeable account with Southern Stone. On December 8, 1977, almost a year after the closing of S&M, Moore went to the office of Southern Stone's counsel and signed a personal note for the account due from TM. On that same day, Southern Stone's counsel sent Moore a letter allegedly recounting some statements that Moore had made concerning the final months of S&M's operations and the date of Sam Singer's decision to end S&M's business. Moore never replied to the letter. After Moore failed to pay on the note, Southern Stone sued him. On August 31, 1978, as part of the settlement of that suit, Southern Stone issued a release to Moore.

## II. ISSUES

This case presents two issues: (1) whether the release to Moore extended to Southern Stone's claims against Moore concerning S&M's operations in late 1976, and (2) whether the letter to Moore from Southern Stone's counsel was improperly admitted.

## III. THE RELEASE

On August 31, 1978, in consideration for Moore's partial payment on the December 8, 1977, note, Southern Stone issued a release to Moore.[1] Moore argues that through this document, Southern Stone released him from any liability arising from his relationship with S&M, the subject matter of this action. Moore contends that the document's release of Moore from "all claims . . . whatsoever, known or unknown" is unambiguous and clearly includes a release from any claim based on his involvement with S&M, which ended over a year and a half before the date of the release. Sam Singer argues that under Georgia law, he is a joint tortfeasor with Moore in the alleged improprieties concerning S&M's finances and thus is also discharged from liability by the release of Moore.

In response, Southern Stone argues that the "all claims" phrase is ambiguous, requiring parol evidence to illuminate the extent of the release. Evidently considering the release to be ambiguous, the district court permitted Southern Stone to introduce parol· evidence concerning the scope of the "all claims" phrase. This evidence clearly establishes that Southern Stone intended to release Moore only from any claim arising from the December 8, 1977, note and from the lime account generated by TM's purchases from Southern Stone. We agree that the release is ambiguous on the question of whether Southern Stone released Moore from claims arising out of Moore's relationship with S&M. Thus, we uphold the introduction of parol evidence on the issue of the parties' intent. Further, because the parol evidence clearly indicates that the release did not extend to Southern Stone's claims against Moore concerning S&M, the jury's implicit finding of that fact is amply supported by the record.

1. The release reads as follows:

   RELEASE
   GEORGIA, MUSCOGEE COUNTY.
   For and in consideration of the sum of Ten Thousand and 00/100 Dollars ($10,000.00), SOUTHERN STONE INDUSTRIES, INC. does hereby release and forever discharge T.M. INC., and THOMAS D. MOORE from the note dated December 8, 1977, as well as any other accounts owed by T.M. INC. or THOMAS D. MOORE to SOUTHERN INDUSTRIES, INC. and from all claims, demands, actions or causes of action whatsoever, known or unknown.
   Because the release refers to "Southern Stone Industries, Inc." and to "Southern Industries, Inc.," the release is clearly ambiguous as to whether it applies to the plaintiff, Southern Stone Company, Inc. Thus, parol evidence was properly admitted on this point. This evidence showed that the plaintiff is a subsidiary of Southern Industries, Inc., and that the plaintiff was intended to be a party to the release. Contrary to the plaintiff's argument, however, the admission of parol evidence as to one ambiguity does not automatically permit the introduction of such evidence as to all parts of the document. Each offer of parol evidence must relate to the clarification of a particular ambiguity. *Andrews v. Skinner*, 158 Ga.App. 229, 279 S.E.2d 523, 526 (1981). Thus, the "all claims" phrase itself must be ambiguous before parol evidence is admissible to explain its meaning.

Because the admissibility of evidence is generally considered to be a procedural question, the Federal Rules of Evidence normally apply to the evidentiary issues in a diversity case. *Johnson v. William C. Ellis & Sons Iron Works, Inc.*, 609 F.2d 820, 821 (5th Cir. 1980). However, the parol evidence rule is considered to be a rule of substantive law, not a rule of "evidence." *Merchants National Bank & Trust Co. v. Professional Men's Association*, 409 F.2d 600, 602 (5th Cir. 1969), *cert. denied*, 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970); *Freeman v. Continental Gin Co.*, 381 F.2d 459, 463 (5th Cir. 1967); *Sperry Rand Corp. v. Industrial Supply Corp.*, 337 F.2d 363, 371 (5th Cir. 1964). We assume that Georgia law is the applicable substantive law in this case because both parties so argued both in the district court and on appeal.[2]

Under Georgia law, parol evidence is admissible to explain ambiguous language in a release. *Andrews v. Skinner*, 158 Ga. App. 229, 279 S.E.2d 523, 525 (1981). In determining the existence of an ambiguity in a release, Georgia law evidently permits reference only to the face of the document. *See id.* Our examination of two Georgia cases persuades us that the Georgia courts would consider the "all claims" phrase of the release of Moore to be ambiguous and thus would permit the introduction of parol evidence.

In *Macris v. Laughlin Insulation Co.*, 124 Ga.App. 573, 185 S.E.2d 413 (1971), a tenant and a landlord mutually released each other from "any and all claims" after a fire substantially destroyed the leased premises.[3] The landlord then sued the tenant alleging that the tenant's negligence caused the fire. 185 S.E.2d at 414. The court held that the

release barred the landlord's action. *Id.* at 415. Observing that the issue was the subject matter of the release, the court determined that the fire and the lease, the two items recited before the phrase "any and all claims," were "clearly" the subject matter of the release. Accordingly, the court ruled that the release was not ambiguous and constituted a discharge of all claims by the parties relating to the fire and to the lease. *Id.*

The release given to Moore is similar to the *Macris* release. Both releases contain the dangling "all claims" phrase. Both releases recite more specific items prior to this phrase. In *Macris*, the items were the fire and the lease. In the release given to Moore, the items are the December 8, 1977, note and "any other accounts" owed by TM or Moore to Southern Stone. No party suggests that the present suit arises out of the December 8, 1977, note or out of any account owed by TM or Moore. Instead, all parties focus on the "all claims" phrase. *Macris* suggests that as to the release given to Moore, the "all claims" phrase is at least ambiguous, if not unambiguous to Moore's detriment, on the issue of whether it extends to any subject matter not specifically recited in the release, including the failure of S&M to satisfy its account with Southern Stone.

Our conclusion in this regard is reinforced by *Warner Robins Supply Co. v. Malone*, 143 Ga.App. 332, 238 S.E.2d 709 (1977). In *Malone*, a businessman executed two promissory notes with his supplier, in satisfaction of an account generated by his business. He later sold his enterprise, but continued in a new business to purchase goods on account with his old supplier. After set-

---

2. *See N. K. Parrish, Inc. v. Southwest Beef Industries Corp.*, 638 F.2d 1366, 1370 n.3 (5th Cir. 1981) (parties and district court interpreted agency agreement under Texas law; because neither party raised or briefed choice of law issue on appeal, Texas law assumed to apply); *Smith v. New York Life Insurance Co.*, 579 F.2d 1267, 1270 n.5 (5th Cir. 1978) (parties bound by legal theories on which they rely in district court, including choice of law in diversity case, absent manifest injustice).

3. The release read as follows:
    The premises leased under agreement of September 3, 1969, having been substantially destroyed by fire, the said lease agreement is hereby canceled, and the parties do, upon consideration thereof, mutually release each other from any and all claims.
   185 S.E.2d at 414.

tling this later account with his supplier, he obtained a document stating that he had "personally business and otherwise paid [the supplier] in full." *Id.* at 711. Without deciding whether the document was a release, an accord and satisfaction or merely a receipt for the checks received, the court held that parol evidence was admissible to explain the scope of the subject matter of the document. *Id.* at 712. Apparently viewing the document as ambiguous, the court observed that "there was a substantial and material issue of fact as to the meaning and intent of the parties in the preparation and execution of the receipt or release." *Id.* The "all claims" phrase in the release given to Moore partakes of the same ambiguity of subject matter as the "paid . . . in full" phrase in *Malone.*

In response, Moore and Singer urge that *Maxey v. Hospital Authority*, 245 Ga. 480, 265 S.E.2d 779 (1980), forecloses the admission of parol evidence. In *Maxey*, a pedestrian injured in an auto accident gave to the car driver a release of "all other persons, firms, and corporations" from all claims arising from the accident. 265 S.E.2d at 781. The court held that the release was clear and unambiguous and discharged a doctor and a hospital from malpractice liability for the pedestrian's post-accident treatment. Yet, the *Maxey* court held that the release was unambiguous only as to the *persons* discharged. *Id.* The court was not faced with the issue of which *claims* were released. Indeed, the *Maxey* release did not contain a dangling "all claims" phrase, but rather specifically recounted the subject matter of the release:

[A]ny and all claims . . . arising from, and by reason of any and all known and unknown, foreseen and unforeseen bodily and personal injuries, damage to property, and the consequences thereof, resulting, and to result, from a certain accident which happened on or about the 7th day of January, 1977. . . .

*Id.* Accordingly, we hold that parol evidence was properly admitted to explain the subject matter to which the "all claims" phrase of the instant release pertained.

## IV. ADMISSION OF THE LETTER

■ The district court permitted the introduction into evidence of a letter written on December 8, 1977, to Moore by Southern Stone's counsel.[4] The letter purports to relate several statements made by Moore to Southern Stone's counsel concerning the activities of Moore and Sam Singer in the final months of S&M's operation and concerning the date Singer decided to end S&M's business. Because the letter was inadmissible and highly prejudicial to both Moore and Sam Singer, we reverse for a new trial as to Southern Stone's claims against them.

■ Southern Stone argues that the letter is admissible under Fed.R.Evid. 801(d)(2)(B) as a statement in which Moore manifested his adoption or his belief in its truth. Although Southern Stone's counsel, not Moore, wrote the letter, Southern Stone argues that Moore's failure to respond to the letter, in the face of a postscript requesting a reply if the letter incorrectly recounted Moore's remarks, sufficiently indicates Moore's adoption or belief in the truth of the letter's contents, in effect

4. The body of the letter reads as follows:

This will confirm our conversation this date at which time you told me that Mr. Singer instructed you to buy on account, all the lime that you could from Southern Stone Company's quarry in Lee County, Alabama, and if necessary to even lease other truck [sic] if S&M's trucks were otherwise busy and to haul the lime from Lee County quarry of Southern Stone Company to S&M Materials Co. in Russell County and at a place that S&M Materials Co. had leased for the special purposes of stockpiling lime outside of Phenix City, Alabama. At the time the instruc-

tions were given to you to buy all the lime that you could on the account of S&M from Southern Stone Company, Inc., Mr. Singer had made the decision on behalf of S&M Materials Company 2 or 3 months before the business closed that S&M Materials Company was going out of business as of December 31, 1976.

I believe this is the same information that you relayed to Mr. Mark C. Gallups sometime ago.

\* \* \* \* \* \*

P.S. If any of the above is incorrect, please advise me.

transforming the letter into Moore's own statement about what he said during the conversation. However, the mere failure to respond to a letter does not indicate an adoption unless it was reasonable under the circumstances for the sender to expect the recipient to respond and to correct erroneous assertions. *See United States v. Hale,* 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975) (failure to contest assertion evidence of acquiescence only if natural under circumstances to object); *Hellenic Lines Ltd. v. Gulf Oil Corp.,* 340 F.2d 398, 401 (2d Cir. 1965) (failure to respond to letter, under circumstances reasonably calling for reply, constitutes admission by silence); 4 Weinstein's Evidence, ¶ 801(d)(2)(B)[01] at 801–146 (1979) (whether silence constitutes admission depends upon whether denial normal under circumstances). All the circumstances surrounding this letter do not support a reasonable expectation of any response. The only reason Moore went to the office of Southern Stone's counsel was to sign a personal note for the account that TM owed Southern Stone. Southern Stone introduced no evidence indicating that Moore was there to discuss any matters relating to his former involvement with S&M, which was the entire subject matter of the letter. Indeed, S&M had ceased operations nearly a year prior to the meeting between Moore and Southern Stone's counsel. Moore testified that the reason he never responded to the letter was that at the time, he was no longer involved with S&M, "didn't care what was going on" and considered that "the corporation was gone." (T–78–79). Moore also testified that he could remember nothing about the conversation. Because of Southern Stone's failure to lay a foundation for the introduction of the letter more solid than Moore's mere failure to respond, the letter did not meet the requirements of Rule 801(d)(2)(B) and could not be admitted on that basis.

Once stripped of its asserted status as, in effect, Moore's own admission as to what he said in the conversation, the letter can be viewed only as a hearsay declaration of Southern Stone's counsel as to what Moore said. The letter involves two levels of hearsay: the letter says that Southern Stone's counsel said (first level) that Moore made certain admissions (second level). Even if Moore's declarations are not hearsay under Fed.R.Evid. 801(d)(2)(A) (statements of a party offered against the party), the first level of hearsay still exists. In attempting to explain why its counsel did not personally testify as to his conversation with Moore, Southern Stone stated that it might be improper for the attorney representing Southern Stone in the trial of this case also to testify on Southern Stone's behalf. Southern Stone should have engaged other trial counsel if it had any reservations about placing its trial attorney on the witness stand. Southern Stone cannot create its own exception to the hearsay rule by failing to retain such other counsel. Because we perceive *no other applicable hearsay exception* for which Southern Stone laid an adequate foundation, the letter was inadmissible.

The admission of the letter was also highly prejudicial to both Moore and Sam Singer. According to the letter, Moore allegedly stated that Singer made the decision to close S&M two or three months before the actual closing date of December 31, 1976. This alleged statement directly contradicts both Moore's and Singer's testimony that the decision was made in mid to late December, 1976. *See Coughlin v. Capitol Cement Co.,* 571 F.2d 290, 307 (5th Cir. 1978) (erroneous admission of letter only partly authorized by plaintiffs harmless because wholly consistent with plaintiffs' live testimony). The date of the decision to close S&M is a critical issue in this case. The judgment that Southern Stone seeks to satisfy is based only upon S&M's lime purchases during November and December, 1976. A date of decision before November, together with Moore's alleged statement that S&M was "stockpiling" lime during November and December, strongly suggests that both Moore and Singer sought through S&M to run up as high an account as possi-

ble with Southern Stone and then not to pay for the lime. Singer also testified that the decision to close S&M was based upon his legitimate desire to quit throwing away his family's money in a losing business and not, as the letter implies, upon his desire to leave Southern Stone with an uncollectable account. Accordingly, we hold that the letter's admission was prejudicial and requires a new trial of Southern Stone's claims against Moore and Sam Singer.[5]

**REVERSED AND REMANDED.[6]**

**5.** We also note that the letter emphatically illustrates one of the classic problems of hearsay evidence: unreliability. Only Moore and Southern Stone's counsel were present at the conversation. Moore testified that he could not remember what he said and Southern Stone's counsel did not take the stand. Thus, the only evidence before the jury on the substance of this damaging conversation was the letter. The jury had no other version of the conversation to compare with the letter's version. Moreover, the author of the letter, as plaintiff's counsel, was hardly a disinterested scrivener. *See Furtado v. Bishop*, 604 F.2d 80, 91 (1st Cir. 1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980) (deceased attorney's affidavit of his conversation with defendant trustworthy and admissible under Fed.R.Evid. 804(b)(5) in part because affiant not plaintiff's attorney, not connected with plaintiff's suit other than through submission of affidavit, and thus disinterested party as to affidavit's subject matter). In addition, although the complaint in this case was filed almost two years after the conversation, the defendants' inability to cross-examine plaintiff's counsel concerning his possible eye toward litigation against Moore and Singer at the time he wrote the letter deprived the jury of significant evidence concerning the credibility of Southern Stone's counsel's version of the conversation.

**6.** In support of the admission of the letter, the dissent focuses on the failure of counsel for Moore and Singer to call the declarant—Southern Stone's counsel—for cross-examination. To place such a duty upon the opponent of the letter in this case would effectively create an exception to the hearsay rule that does not exist. Under the dissent's rule, hearsay would be admissible whenever the declarant is present in court, simply because the opponent could call the declarant for cross-examination as to the hearsay statements. Such an exception to the hearsay rule was expressly rejected by the Advisory Committee on the Federal Rules of Evidence. *See* 4 Weinstein's *Evidence* ¶ 801(d)(1)[01] at 801–79 to 801–81 (1979). *See also United States v. Mathis*, 559 F.2d 294, 298–99 (5th Cir. 1977) (criminal case holding that the unavailability of declarant is a necessary condition for admission of hearsay under the residual exception of Fed.R.Evid. 803(24), because of the requirement under that exception that the proponent of the hearsay use reasonable efforts to procure the most proba-

tive evidence on the point for which hearsay was offered).

The dissent suggests several arguments that admission of the letter was harmless error. We concede some force in the argument that the error is harmless because Moore and Singer could have called the declarant as a witness. To accept the argument that error is harmless for this reason alone, however, would constitute the adoption of an exception to the hearsay rule which was explicitly rejected by the Advisory Committee. We therefore reject the argument.

The dissent also argues that the error was harmless because Southern Stone's counsel read the letter in the presence of the jury in an effort to refresh Moore's memory. However, this was done over the repeated objections of Moore's counsel, over the district court's instruction to Southern Stone's counsel not to read the letter (Record, vol. 3, at 79), and despite Moore's prior, repeated assertions that he could not remember the conversation. In any event, because counsel's mere reading of the letter would not constitute evidence, the admission of the letter cannot be viewed as cumulative.

The dissent further notes that Gallups testified that Moore told him that during the latter part of 1976, S&M was to get all the lime it could from Southern Stone. However, this testimony makes the letter cumulative only as to one of Moore's alleged statements. The letter is apparently the only evidence supporting a crucial point, *i. e.*, a pre-November, 1976, date for the decision to close S&M. In addition to using loaded terms like "stockpiling" lime, the letter still contradicts (1) Moore's and Singer's testimony that the decision to close S&M was made in mid to late December, 1976, and (2) Singer's testimony that the decision to close was based on legitimate family and business reasons.

The dissent also argues that very little difference will exist between the trial that will occur on remand and the trial presently before us. On the contrary, the new jury will have significant additional evidence, going both to substance and to credibility, concerning Moore's statements. The jury will have the opportunity to observe Southern Stone's counsel's demeanor as he testifies, and counsel for Moore and Singer will have the opportunity to cross-examine him as to precisely what Moore said. This difference reflects the basic rationale behind the hearsay rule.

RONEY, Circuit Judge, dissenting:

I respectfully dissent from the reversal of this jury verdict because of the possible erroneous admission of one piece of evidence.

The letter admittedly recited a conversation between defendant Moore and the writer of the letter, Hardegree. Even if it could not be admitted as an admission in view of Moore's failure to respond, any hearsay problem could have been eliminated because Moore and Hardegree were both available in the courtroom to be examined about that conversation. The objection was made in this fashion:

> MR. GOWER: Your Honor, we would like to object to the introduction of the letter from Mr. Hardegree in that it's an attempt on the part of Mr. Hardegree as counsel for Southern Stone to impeach Mr. Moore by a letter which Mr. Hardegree wrote. And I don't presume Mr. Hardegree is going to take the stand and allow us to cross-examine him. And unless he's going to allow us to cross-examine him, that letter is not admissible as an attempt to impeach or for any other purpose.

After the court admitted the letter, no attempt was made to call Hardegree for cross-examination. Although Hardegree was trial counsel for Southern, that fact would not prevent Moore from calling him as an adverse witness to cross-examine him about the letter and the conversation. Calling opposing trial counsel may raise ethical questions for that counsel and his client, but that was not Moore's problem. Hardegree was available for cross-examination, and appellants' failure to call him should not cause this Court to require a retrial of this case.

In any event, the substance of the letter had been read to Moore in front of the jury during his cross-examination to revive his memory of the conversation. He still could not remember the conversation. During Mr. Gallups' examination, he testified Moore had told him that S & M Materials was "to get all [the lime] they could" during the later part of 1976, corroborating part of the letter.

In the next trial, the evidence will get in if it is crucial. Hardegree can take the stand and testify as to Moore's statements. Under Fed.R.Evid. 801(d)(2)(A), this will be admissible. Moore will either deny them or deny knowledge of them, and everything else will remain the same. *See Lenz v. Southern Pacific Co.*, 493 F.2d 471 (5th Cir. 1974) (hearsay did not affect outcome of trial).

To my mind any technical error here is not reversible error, and the judgment should be affirmed.